Filed 2/28/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PAVEL GOSTEV, <br><br>     Plaintiff and Respondent, <br> v. <br><br> SKILLZ PLATFORM, INC., <br><br>     Defendant and Appellant. | A164407 <br><br> (San Francisco County <br> Super. Ct. No. CGC-21-589818) |

Defendant Skillz Platform, Inc. (Skillz) appeals from an order denying its petition to compel arbitration. Skillz contends the trial court erred, first, by not referring questions of arbitrability to arbitration and, second, by finding the arbitration agreement unconscionable.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Parties and the Terms of Service*

Skillz provides a mobile platform that hosts games in which players can pay to compete against each other for cash prizes. To play games on its platform, a user must establish a player account, and to participate in paid-entry competitions, a user must save the player account. To save a player account, a user must provide an email address and verify age by entering the user's date of birth; after entering a date of birth, the user must tap a box with the word "Next" on it. Below the "Next" box is the advisory statement, "By tapping 'Next,' I agree to the Terms of Service and the Privacy Policy."

1

The underlined text is a hyperlink, which, if tapped, takes the user to the Skillz' terms of service.

Gostev is a resident of the state of Washington who played the Skillz game "Solitaire Cube" on his mobile device. He saved a Skillz player account in July 2019. The version of the "User Terms and Conditions of Service" (Terms of Service)[1] then in effect begins: "Welcome to Skillz! We hope you'll enjoying being a part of our community by participating in our online gaming challenges, competitions and tournaments (collectively, 'Competitions') and using other applications, tools and services that we may provide from time to time (together with Competitions, the 'Services')." It goes on to explain that by registering an account or using Skillz' services, the user agrees to be bound by the terms (with "Terms" defined as "these Terms and Conditions of Service, the terms of any policy incorporated herein, and the Rules").

*The Agreement to Arbitrate in the Terms of Service*

The 15-page Terms of Service has 15 sections. The first section begins: "1. GENERAL TERMS

"1.1. Arbitration. TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, ANY CLAIM, DISPUTE OR CONTROVERSY OF WHATEVER NATURE ('CLAIM') ARISING OUT OF OR RELATING TO THESE TERMS AND/OR OUR SOFTWARE OR SERVICES MUST BE RESOLVED BY FINAL AND BINDING ARBITRATION IN ACCORDANCE WITH THE PROCESS DESCRIBED IN SECTION 14 BELOW. PLEASE READ SECTION 14 CAREFULLY. To the maximum extent permitted under

---

[1] A copy of the "User Terms and Conditions of Service" was attached as an exhibit to the declaration of Joseph Asaro filed in support of Skillz' petition to compel arbitration. On appeal, Gostev agrees this document represents the applicable Terms of Service.

applicable law, you are giving up the right to litigate (or participate in as a party or class member) all disputes in court before a judge or jury."

Section 14, "DISPUTE RESOLUTION AND ARBITRATION," starts at page 13: "14.1. General.  This Section applies to any Dispute except for Disputes relating to the enforcement or validity of our intellectual property rights.  The term 'Dispute' means any dispute, action, or other controversy between you and us concerning these Terms, the Services or any product, service or information we make available to you, whether in contract, warranty, tort, statute, regulation, ordinance, or any other legal or equitable basis.  'Dispute' will be given the broadest possible meaning allowable under law."[2]

Subsection 14.1 requires written notice of a dispute and "informal negotiation" after which either party may commence arbitration.  Alternatively, the parties may bring claims that qualify for its jurisdiction in small claims court.  Subsection 14.2 provides, "If you and we do not resolve

[2] Elsewhere in the Terms of Service, however, Skillz appears to reserve for itself the ability to sue users in court for claims that could be understood to be "Disputes."  Section 7, "ACCEPTABLE USE POLICY," requires users, among other things, to refrain from engaging in "behavior that may be interpreted, in [Skillz'] sole discretion, as unfair methods in participating in Services or using the Software."  Subsection 7.3 provides, "Without limiting our other available remedies, we may institute or seek any injunctive relief, *civil* and/or criminal *proceedings* against you and/or any of your co-conspirators arising out of or related to your commission of Abuse, including without limitation recovering all of our fees and expenses (including reasonable attorneys' fees) in connection with such efforts."  (Italics added.)  Section 8 addresses account funds and payments.  Subsection 8.10 provides, "Any attempt to defraud through the use of credit cards or other methods of payment, regardless of the outcome, or *any failure by you to honor legitimate charges or requests for payment*, *will result in* immediate termination of your Account, forfeiture of Winnings, and *pursuit of civil litigation* and/or criminal prosecution."  (Italics added.)

3

any Dispute by informal negotiation or in small claims court, any other effort to resolve the Dispute will be conducted exclusively by binding arbitration as described in this Section." Subsection 14.3 includes waivers of the rights to bring class actions and representative actions.

Subsection 14.4. requires arbitration to be "conducted by the American Arbitration Association (the 'AAA') under its Commercial Arbitration Rules" and commenced "only in San Francisco, California, USA." It limits the arbitrator's authority to award damages or injunctive relief, requires splitting the costs of arbitration, and authorizes the arbitrator to award attorney fees to the prevailing party.[3]

Subsection 14.5 provides that all claims "must be filed within one year," and any claim or dispute that is not filed within one year is "permanently barred."[4] Subsection 14.6, "Equitable Relief," provides: "You agree that we

---

[3] Subsection 14.4 provides in part, "The arbitrator may award the same damages to you individually as a court could. The arbitrator may award declaratory or injunctive relief only to you individually, and only to the extent required to satisfy your individual claim. These Terms govern to the extent they conflict with the arbitrators' commercial rules. The arbitrator may award compensatory damages, but shall NOT be authorized to award non-economic damages, such as for emotional distress, or pain and suffering or punitive or indirect, incidental or consequential damages. Each party shall bear its own attorneys' fees, costs and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the arbitrator and AAA; however, the arbitrator may award to the prevailing party reimbursement of its reasonable attorneys' fees and costs (including, for example, expert witness fees and travel expenses), and/or the fees and costs of the arbitrator."

[4] Claims against Skillz of billing error are further time-limited. Subsection 8.2 of the Terms of Service requires users to notify Skillz of errors on their bills within 120 days. It provides, "If you don't tell us within that time, we'll not be liable for any losses resulting from the error and we won't be required to correct the error or provide a refund." It also provides that users "must pay for all reasonable costs [Skillz] incur[s] to collect any past

4

would be irreparably damaged if these Terms were not specifically enforced. Therefore, in addition to any other remedy we may have at law, and notwithstanding our agreement to arbitrate Disputes, we are entitled without bond, other security, or proof of damages, to seek appropriate equitable remedies with respect to your violation of these Terms in any court of competent jurisdiction."

The Terms of Service also limits Skillz' liability in various ways.[5]

*Gostev's Lawsuit*

In February 2021, Gostev sued Skillz in San Francisco County Superior Court. In the operative complaint, he alleged Skillz' games constitute gambling games in violation of California and federal law and, "in carrying out its gambling enterprise, Skillz engages in predatory and unlawful

---

due amounts, including without limitation reasonable attorneys' fees and other legal fees and costs."

[5] Section 13, "Limitations of Liability," for example, provides: "To the maximum extent permitted under applicable law, neither we, nor our suppliers or licensors, will be liable to you or any third party for any indirect, special, punitive, consequential (including, without limitation, lost profits, lost data or loss of goodwill), or incidental damages, arising out of or relating to these terms, the website, or any information, services, products or software made available or accessible to you, whether based on a claim or action of contract, warranty, negligence, strict liability, or other tort, breach of any statutory duty, indemnity or contribution, or otherwise, even if we or our third party suppliers or licensors have been advised of the possibility of such liability. [¶] To the maximum extent permitted under applicable law, our maximum liability to you arising out of or in any way connected to these terms shall not exceed U.S. $ 50.00. The existence of one or more claims by you will not increase our liability. In no event shall our suppliers or licensors have any liability arising out of or in any way connected to our products, information or services. [¶] Certain jurisdictions do not allow limitations of liability for incidental, consequential or certain other types of damages; as such, the limitations and exclusions set forth in this Section may not apply to you." (Capitalization omitted.)

practices to take advantage of their customers." He brought claims of violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.; UCL), violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.; CLRA), and unjust enrichment, and he sought declaratory, injunctive, and equitable relief, including restitution.

Gostev was aware of the arbitration provision in the Terms of Service when he filed his lawsuit, and he addressed it in his complaint, alleging the agreement to arbitrate was unenforceable because it prohibited public injunctive relief in violation of *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945 (*McGill*), and because it was unconscionable.[6]

*Skillz' Petition to Compel Arbitration*

Skillz petitioned to compel arbitration. Skillz argued that, as a threshold matter, Gostev's challenges to the enforceability of the arbitration provision had to be submitted to an arbitrator and, substantively, the arbitration provision was valid and covered Gostev's claims. Opposing the petition, Gostev argued there was no clear and unmistakable evidence the parties intended an arbitrator would decide the threshold question of arbitrability; there was no enforceable agreement to the Terms of Service; and the arbitration provision was procedurally and substantively unconscionable.

*The Court's Ruling*

In its written order and statement of decision, the trial court found Skillz demonstrated the existence of an arbitration agreement but rejected

---

[6] Gostev also alleged Skillz waived its ability to enforce the arbitration provision because Gostev demanded arbitration on February 9, 2020, and Skillz "did not honor its arbitration clause, or even respond." On appeal, Gostev no longer claims Skillz waived its right to arbitrate by failing to respond to his demand.

6

Skillz' argument that the parties delegated the issue of arbitrability to the arbitrator. The court went on to find the arbitration agreement procedurally and substantively unconscionable. At the hearing on the petition, the court observed, "I've got to say that we've look[ed] at a lot of these arbitration cases and . . . this is the longest list of unconscionable features that I think I've ever seen." In its written decision, the court identified as substantively unconscionable provisions, "inter alia, that plaintiff's damages are limited, the arbitration must occur in San Francisco, plaintiff only has one year to bring his claim, the parties must split the arbitration fees and costs, and defendant can obtain equitable relief without posting a bond or security." Finding that "unconscionability permeates the agreement such that severance is unavailable," the court denied the petition to compel arbitration.

Skillz timely appealed.

## DISCUSSION

A.  *Standard of review*

"The party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.) When the evidence is not in conflict, we review the trial court's denial of a petition to compel arbitration de novo. (*Ibid.*) We review the trial court's findings of disputed fact for substantial evidence; we review its finding of unconscionability based on those facts de novo. (*Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771, 795 (*Ajamian*).)

B.  *Who Decides the Threshold Question of Enforceability?*

The usual presumption is that a court, not an arbitrator, will decide in the first instance whether a dispute is arbitrable. (*Ajamian*, *supra*, 203

7

Cal.App.4th at p. 781; *Dennison v. Rosland Capital LLC* (2020) 47 Cal.App.5th 204, 209 (*Dennison*).)  The parties may agree to delegate authority to the arbitrator to decide arbitrability, but given the contrary presumption, evidence that the parties intended such a delegation must be " 'clear and unmistakable' " before a court will enforce a delegation provision. (*Ajamian*, *supra*, at p. 781; *Dennison*, *supra*, at p. 209.)  "This is a 'heightened standard,' higher than the evidentiary standard applicable to other matters of interpreting an arbitration agreement." (*Ajamian*, *supra*, at p. 790.)

Skillz contends it has met this heightened evidentiary standard because (1) the parties "expressly agree[d]" to delegate arbitrability and (2) the parties incorporated the AAA Commercial Arbitration Rules into their arbitration agreement.  We are not persuaded.

### 1.  No Express Agreement

Skillz relies on the following language in Section 14 of the Terms of Service: "The term 'Dispute' means *any dispute*, action, or other *controversy* between you and us *concerning these Terms*, the Services or any product, service or information we make available to you, whether in contract, warranty, tort, statute, regulation, ordinance, or any other legal or equitable basis.  'Dispute' will be given the broadest possible meaning allowable under law."  (Italics added.)  Skillz argues, "By expressly agreeing to arbitrate any 'dispute[s]' and 'controvers[ies]' about the Terms of Service, the parties clearly and unmistakably agreed to arbitrate questions such as whether certain of those Terms are unconscionable and thus unenforceable."  We disagree.

In *Ajamian*, the plaintiff brought employment claims against her former employers, the defendants petitioned to compel arbitration, and the trial court denied arbitration on the ground the agreement was

8

unconscionable. (*Ajamian, supra,* 203 Cal.App.4th at pp. 775, 779.) On appeal, the defendants argued the question of unconscionability should have been decided in arbitration. The arbitration provision in that case provided, " 'Any *disputes,* differences or *controversies arising under this Agreement* shall be settled and finally determined by arbitration,' " and " 'It is expressly agreed that arbitration as provided herein shall be the exclusive means for determination of *all matters arising in connection with this Agreement* and neither party hereto shall institute any action or proceeding in any court of law or equity other than to request enforcement of the arbitrators' award hereunder. The foregoing sentence shall be a bona fide defense to any action or proceeding instituted contrary to this Agreement.' " (*Ajamian, supra,* 203 Cal.App.4th at p. 783, italics added.)

The Court of Appeal rejected the defendants' delegation argument. The court reasoned: "It is true that one reasonable inference from this language is that the parties, in designating arbitration as the exclusive means for determining '*[a]ny* disputes, differences or controversies' (and precluding court actions and providing a defense to them on this ground) intended that even threshold issues of unconscionability would be decided by the arbitration panel. But another reasonable inference is that all of this language is only intended to bring within the exclusive scope of arbitration all *substantive* disputes, claims or controversies on which a court action might otherwise be brought, while the *enforceability* of the arbitration provision itself remains a matter for determination by a court. Indeed, because that is the usual expectancy of the parties, the absence of any express language pertaining to threshold enforceability questions either reinforces that proposition or at least fails to cure the ambiguity. In light of the possibility of these two conflicting inferences, the language fails to meet

9

the test of *clear and unmistakable* evidence." (*Ajamian, supra*, 203 Cal.App.4th at p. 783.)

The *Ajamian* court further explained: "Language such as 'any disputes, differences or controversies' may well be adequate and necessary for the parties to express their intention to arbitrate all *substantive* claims, since the number and diversity of potential future substantive claims is so great as to defy a specific enumeration of each type. But the issue of who would decide the enforceability of the arbitration clause *itself* is a horse of a different color. It is a distinct issue that could and would be easily addressed—if the parties actually contemplated it at the time of contracting—by stating expressly that the arbitrator shall decide questions of the enforceability of the arbitration provision. Because such issues are normally decided by the court, parties who consider the matter and want the issues to be decided instead by the arbitrator would most likely spell out their unusual intention in the arbitration provision. The absence of such express language (or extrinsic evidence to the same effect) therefore gives rise to the inference that the parties did *not* consider the matter. Indeed, because the issue is arcane and *not* likely contemplated by the parties, silence or ambiguity as to who would decide the enforceability of the arbitration provision suggests it was not a matter on which the parties mutually agreed and, therefore, the enforceability issue *cannot* be arbitrated—no matter how much public policy favors the notion of arbitration generally." (*Ajamian, supra*, 203 Cal.App.4th at pp. 786–787.)

Similarly, in *Nelson v. Dual Diagnosis Treatment Center, Inc.* (2022) 77 Cal.App.5th 643, 655 (*Nelson*), the proponent of an arbitration agreement argued delegation to the arbitrator to decide arbitrability was reflected "in the broad language of their arbitration clause which states a general desire

10

for disputes to be resolved 'without litigation,' " including language expressing the parties' " 'desire to resolve *any* dispute, whether based on contract, tort, statute or other legal or equitable theory *arising out of or related to* this Agreement . . . or the breach or termination of this Agreement . . . without litigation.' " The appellate court rejected the delegation argument: "While this language might permit an inference the parties intended that an arbitrator should resolve arbitrability questions (i.e., 'any dispute'), such an intent is *not clear and unmistakable.* The clause does not mention arbitrability, nor is it mentioned anywhere else in the agreement." (*Ibid.*, some italics added.)

We find the reasoning of *Ajamian* and *Nelson* persuasive.[7] Here, Skillz does not point to any language that clearly and unmistakably authorizes the arbitrator to decide threshold questions of arbitrability. The language that the word "dispute" in the Terms of Service includes "any dispute . . . concerning these Terms" and "will be given the broadest possible meaning allowable under law" could reasonably be understood to express no more than the parties' "intention to arbitrate all *substantive* claims, since the number and diversity of potential future substantive claims is so great as to defy a specific enumeration of each type." (*Ajamian, supra,* 203 Cal.App.4th at p. 786.) Because the usual expectation of the parties would be that a court, not an arbitrator, decides threshold issues of arbitrability, "the absence of any express language pertaining to threshold enforceability questions . . . fails to cure the ambiguity." (*Id.* at p. 783.)

---

[7] Accordingly, we decline Skillz' invitation to follow contrary federal authority. "[W]e are not bound by decisions of the lower federal courts, even on federal questions." (*Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 320.)

Skillz has not shown the parties expressly agreed to delegate questions of arbitrability to arbitration.

2.    Reference to AAA Commercial Arbitration Rules is Not Enough

Subsection 14.4 of the Terms of Service specifies that for users in the United States, "any arbitration will be conducted by the American Arbitration Association (the 'AAA') under its Commercial Arbitration Rules." These rules, in turn, provide, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  (AAA Commercial Arbitration Rules, R-7, subd. (a).)

For its position that the reference to the AAA Commercial Arbitration Rules alone proves the parties' intent to delegate threshold questions of enforceability to the arbitrator, Skillz relies on *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 557 (*Dream Theater*).  There, the Court of Appeal held that when a "[c]ontract provides for arbitration in conformance with rules that specify the arbitrator will decide the scope of his or her own jurisdiction, the parties' intent is clear and unmistakable, even without a recital in the contract that the arbitrator will decide any dispute over arbitrability." (*Id*. at p. 557.)

Notably, *Dream Theater* involved a purchase agreement and subsequent business dispute between corporate buyers and sellers of an Internet-based multimedia and entertainment business.  (*Dream Theater*, *supra*, 124 Cal.App.4th at p. 550.)  Thus, the disputants were sophisticated parties of reasonably equal bargaining power.  But here we are evaluating an arbitration provision found in the terms of service between a mobile application business and a user of its service.  As one district court observed,

12

"Although incorporation [of AAA arbitration rules] by reference may fairly be deemed a clear and unmistakable delegation where there are sophisticated parties, a different result may obtain where one party is unsophisticated. For an unsophisticated plaintiff to discover she had agreed to delegate gateway questions of arbitrability, she would need to locate the arbitration rules at issue, find and read the relevant rules governing delegation, and then understand the importance of a specific rule granting the arbitrator jurisdiction over questions of validity—a question the Supreme Court itself has deemed ' "rather arcane." ' " (*Eiess v. USAA Federal Savings Bank* (N.D. Cal. 2019) 404 F.Supp.3d 1240, 1253 (*Eiess*).)

In *Eiess*, a deposit agreement between a bank and a customer incorporated by reference "JAMS and/or AAA's rules," both of which included rules that disputes over contract formation and validity were to be decided by the arbitrator. (404 F.Supp.3d at pp. 1245, 1248, 1252.) The bank argued the gateway issue of whether the deposit agreement was valid was for the arbitrator to decide, but the district court concluded the incorporation language was insufficient to show the customer "clearly and unmistakably agreed to delegation, particularly in the absence of any evidence that she possesses a heightened level of sophistication." (*Id*. at p. 1254.)

The *Ajamian* court also declined to follow *Dream Theater* in the context of an employment agreement. Considering the same argument Skillz makes now, the court reasoned: "In our view, while the incorporation of AAA rules into an agreement might be sufficient indication of the parties' intent in other contexts, we seriously question how it provides *clear* and *unmistakable* evidence that an employer and an employee intended to submit the issue of the unconscionability of the arbitration provision to the arbitrator, as opposed to the court. There are many reasons for stating that the arbitration

13

will proceed by particular rules, and doing so does not indicate that the parties' motivation was to announce who would decide threshold issues of enforceability." (*Ajamian*, *supra*, 203 Cal.App.4th at p. 790.)

The *Ajamian* court continued: "[W]e must be mindful of what the United States Supreme Court has emphasized unflinchingly for decades: notwithstanding the public policy favoring arbitration, arbitration can be imposed only as to issues the parties agreed to arbitrate; given the slim likelihood that the parties actually contemplated who would determine threshold enforceability issues, as well as the default presumption that such issues would be determined by the court, those threshold issues must be decided by the court absent *clear and unmistakable* proof to the contrary. This is a 'heightened standard,' higher than the evidentiary standard applicable to other matters of interpreting an arbitration agreement. (*Rent–A–Center,* [*West, Inc. v. Jackson* (2010) 561 U.S. 63, 69], fn. 1; *First Options* [*of Chicago, Inc. v. Kaplan* (1995)] 514 U.S. [938,] 944 [contrasting 'ordinary state-law principles that govern the formation of contracts' with the clear and unmistakable rule].) As the court cogently explained in *Gilbert Street* [*Developers, LLC v. La Quinta Homes, LLC* (2009) 174 Cal.App.4th [1185,] 1191–1192: '[I]t is not enough that ordinary rules of contract interpretation simply yield the result that arbitrators have power to decide their own jurisdiction. Rather, the result must be clear and unmistakable, because the law is solicitous of the parties actually *focusing* on the issue. Hence silence or ambiguity is not enough.' " (*Ajamian*, *supra*, 203 Cal.App.4th at pp. 790–791.)

Likewise, in *Beco v. Fast Auto Loans, Inc.* (2022) 86 Cal.App.5th 292 (*Beco*), an employment agreement incorporated AAA rules but did not attach the rules or provide a means of locating and reading them before the

14

employee signed the agreement. In that circumstance, the court observed, "Concluding that [the employee] actually considered and consciously agreed to delegate the issue of arbitrability would be a complete fiction. While such fictions might be permissible in other areas of arbitration law, that is not the case with delegation, which requires meeting a ' " 'heightened standard.' " ' " (*Id*. at p. 306.) We believe Gostev is more like the former employees in *Ajamian* and *Beco* and the bank customer *Eiess* than the corporate seller in *Dream Theater*. We also agree with the reasoning of *Ajamian*, *Beco*, and *Eiess* and therefore conclude the incorporation by reference of AAA Commercial Arbitration Rules does not provide clear and unmistakable evidence the parties intended to delegate to the arbitrator the question of unconscionability in this case.

We do not find the federal authority cited by Skillz persuasive. (E.g., *G.G. v. Valve Corporation* (9th Cir. 2020) 799 Fed.Appx. 557, 558 [under Washington state law, "teenagers clearly and unmistakably agreed to arbitrate questions of arbitrability because the arbitration agreement incorporates AAA rules"], but see *Cooper v. Agrify Corporation* (W.D. Wash., June 2, 2022, No. C21-0061RSL-JRC) 2022 WL 2374587, at *3 & fn.2 [declining "to presume knowledge on the part of an unsophisticated party where there is no evidence that he was familiar with the referenced [AAA] rules or had any reason to suspect that the reference was in fact a separate contractual obligation requiring review and assent"].) And, as we have noted, we are not bound by the decisions of the lower federal courts. (*Etcheverry v. Tri-Ag Service, Inc.*, *supra*, 22 Cal.4th at p. 320.) Skillz argues that parties are presumed to have existing law in mind when they execute their contracts, suggesting the parties here would have assumed federal authority such as *Brennan v. Opus Bank* (9th Cir. 2015) 796 F.3d 1125 (*Brennan*), applied to

15

the Terms of Service.[8]  Yet, *Ajamian* was also existing law in California when Gostev agreed to the Terms of Service.  The *Ajamian* court explained, "There are many reasons for stating that the arbitration will proceed by particular rules, and doing so does not indicate that the parties' motivation was to announce who would decide threshold issues of enforceability." (*Ajamian*, *supra*, 203 Cal.App.4th at p. 790.)  Skillz, which drafted the Terms of Service and was presumably aware of *Ajamian*, could have expressly stated in the arbitration provision that threshold questions of enforcement were to be delegated to the arbitrator, but it did not do so.

In short, Skillz has failed to establish the parties clearly and unmistakably delegated threshold issues of arbitrability to the arbitrator.[9]

---

[8] In *Brennan*, the Ninth Circuit Court of Appeals held "that incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability" on the facts of the case (796 F.3d at p 1130), but the court expressly did *not* decide " 'the effect [if any] of incorporating [AAA] arbitration rules into consumer contracts' or into contracts of any nature between 'unsophisticated' parties" (*id*. at p. 1131).

[9] Skillz argues at length that the trial court's finding of no clear and unmistakable delegation conflicts with *Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880.  Generally, when a contract includes a severability clause stating a "court of competent jurisdiction" may excise an unenforceable provision, the reference to a court creates an ambiguity about who will decide threshold issues of arbitrability and precludes a finding of clear and unmistakable delegation to arbitration.  (See *Dennison*, *supra*, 47 Cal.App.5th at pp. 209–210.)  Here, the trial court described the *Dennison* holding and noted the Terms of Service contains such a severability clause. But in *Aanderud*, the court held a severability clause referring to a court of competent jurisdiction did not create an ambiguity where (1) there was an express delegation clause (which the appellants conceded) and (2) the arbitration provision also permitted certain claims to be brought in small claims court.  (*Aanderud*, *supra*, 13 Cal.App.5th at pp. 891, 893–894.)  Skillz points out that the arbitration provision in this case also allows claims to be heard in small claims court.  *Aanderud* is distinguishable because, here, the

16

C.	*Unconscionability*

"Under both federal and state law, arbitration agreements are valid and enforceable, unless they are revocable for reasons under state law that would render any contract revocable," such as the contract defenses of fraud, duress, or unconscionability.  (*Tiri v. Lucky Chances, Inc.* (2014) 226 Cal.App.4th 231, 239.)

"The unconscionability doctrine ensures that contracts, particularly contracts of adhesion,[10] do not impose terms that have been variously described as ' " 'overly harsh' " ' [citation], ' " 'unduly oppressive' " ' [citation], ' "so one-sided as to 'shock the conscience' " ' [citation], or 'unfairly one-sided' [citation].  All of these formulations point to the central idea that the unconscionability doctrine is concerned not with 'a simple old-fashioned bad bargain' [citation], but with terms that are 'unreasonably favorable to the more powerful party' [citation].  These include 'terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central

---

Terms of Service contains no express delegation language.  And, in any event, we have concluded Skillz failed to show clear and unmistakable delegation of threshold issues to the arbitrator without considering the severability clause.  Skillz' argument regarding *Aanderud* is unavailing.

[10] Contracts of adhesion refers to a standardized contract "offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 126 (*OTO*).)

aspects of the transaction.' " (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1145 (*Sonic*).)

"A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. [Citation.] Under this standard, the unconscionability doctrine ' "has both a procedural and a substantive element." ' [Citation.] 'The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.' " (*OTO, supra*, 8 Cal.5th at p. 125.)

"Both procedural and substantive unconscionability must be shown for the defense to be established, but 'they need not be present in the same degree.' [Citation.] Instead, they are evaluated on ' "a sliding scale." ' [Citation.] '[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to' conclude that the term is unenforceable[, and] . . . the more deceptive or coercive the bargaining tactics employed, the less substantive unfairness is required. [Citations.] . . . 'The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement.' " (*OTO, supra*, 8 Cal.5th at pp. 125–126.)

1.      Procedural Unconscionability

" '[T]here are degrees of procedural unconscionability. At one end of the spectrum are contracts that have been freely negotiated by roughly equal parties, in which there is no procedural unconscionability. . . . Contracts of adhesion that involve surprise or other sharp practices lie on the other end of

18

the spectrum. [Citation.] Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced [citation], contain a degree of procedural unconscionability even without any notable surprises, and "bear within them the clear danger of oppression and overreaching." ' " (*Baltazar v. Forever 21, Inc*. (2016) 62 Cal.4th 1237, 1244 (*Baltazar*).)

Here, the Terms of Service is a consumer contract that was offered on a take-it-or-leave-it basis, which, in itself, "is sufficient to establish some degree of procedural unconscionability." (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 915 (*Sanchez*).)

In addition, " '[p]rocedural unconscionability focuses on oppression or unfair surprise,' " (*Penilla v. Westmont Corp.* (2016) 3 Cal.App.5th 205, 214), and an arbitration clause that is "confusing" and "contradictory" may constitute unfair surprise (*id*. at p. 216). Gostev points to confusing and contradictory provisions in the Terms of Service regarding arbitration. For example, subsection 1.1's statement that "any claim, dispute or controversy" relating to "these terms and/or our software or services must be resolved by final and binding arbitration," appears to be contradicted by subsection 7.4, which specifies that any interference "with procedures or performance of . . . Software . . . is subject to civil . . . prosecution," and subsection 8.10, which contemplates that Skillz will pursue "civil litigation" if a user fails to honor a request for payment. Gostev also argues users would be surprised to find that, according to a AAA fee schedule effective May 2018, the filing fee for nonmonetary claims is $6,250 (and this fee does not include arbitrator

19

compensation).[11] We are satisfied that Gostev has established procedural unconscionability.

"Yet 'a finding of procedural unconscionability does not mean that a contract will not be enforced' "; rather, it means " 'that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided.' " (*Sanchez*, *supra*, 61 Cal.4th at p. 915.) Accordingly, we consider Gostev's claims of substantive unconscionability.

2.     Substantive Unconscionability

Gostev contends the arbitration provision in this case is substantively unconscionable because: (1) the terms are not mutual, (2) the provision precludes public injunctive relief, (3) it shortens limitations periods, (4) it requires arbitration in San Francisco, California, and (5) the attorneys' fees and costs provisions contravene the CLRA and impose excessive costs. We have no difficulty concluding the arbitration provision is substantively unconscionable.

a.     *One-Sided and Non-Mutual Terms*

Mutuality is the " 'paramount consideration' " in assessing substantive conscionability. (*Davis v. Kozak* (2020) 53 Cal.App.5th 897, 910.) " 'Agreements to arbitrate must contain at least " 'a modicum of bilaterality' " to avoid unconscionability.' " (*Ibid*.)

---

[11] In *Nelson*, *supra*, 77 Cal.App.5th at pages 660–661, the Court of Appeal recognized the degree of procedural unconscionability may " 'rise[ ] to a moderate level' when the party drafting the agreement fails to provide a copy of the applicable arbitration rules" and the nondrafting party claims to be surprised by an element of the AAA rules. The Terms of Service neither lists the filing fees associated with AAA arbitration nor describes how to find the fee schedule, and a user of Skillz' platform would likely be surprised to find that arbitration entailed filing fees so much higher than court filing fees.

Gostev points out the requirement to arbitrate disputes in this case is not mutual. The arbitration provision excludes from arbitration claims related to Skillz' (but not users') intellectual property rights.[12] It grants Skillz (but not users) authority "to seek appropriate equitable remedies with respect to your [i.e., users'] violation of these Terms in any court of competent jurisdiction" "without bond, other security, or proof of damages." It provides that Skillz (but not users) may institute "civil" proceedings for claims related to billing and alleged "unfair methods in participating in Services or using the Software." (See fn. 2, *ante*.)

Skillz' defense of these non-mutual terms is not persuasive. It relies on *Tompkins v. 23andMe, Inc.* (9th Cir. 2016) 840 F.3d 1016, 1031, in which the Ninth Circuit Court of Appeals, applying California's unconscionability doctrine, concluded a provision "excluding intellectual property claims from mandatory arbitration is not unconscionable." *Tompkins* is distinguishable because the exclusion in that case was mutual; it excepted from arbitration any "dispute relating to intellectual property rights, obligations, or any infringement claims" (*id.* at p. 1021), not disputes related solely to the *drafter's* intellectual property rights. (See *Perez v. DirecTV Group Holdings, LLC* (C.D. Cal. 2017) 251 F.Supp.3d 1328, 1347 (*Perez*) ["in *Tompkins*, the provision at issue allowed 23andMe's *customers* to retain intellectual property rights, including rights in user-generated content and genetic information, and to bring suit in court against 23andMe to vindicate those rights"; thus "the intellectual property provision contained 'more than [the] "modicum of bilaterality" ' required for a valid contract"].)

---

[12] Section 14 on arbitration provides that "[t]his Section applies to any Dispute except for Disputes relating to the enforcement or validity of *our* [i.e., Skillz'] intellectual property rights." (Italics added.)

21

Next, Skillz argues there is no problem with an agreement that allows the drafting party alone the right to seek equitable relief in court because the nondrafting party can seek equitable relief in arbitration. While it is true that "[b]oth California and federal law treat the substitution of arbitration for litigation as the mere replacement of one dispute resolution forum for another, resulting in no inherent disadvantage" (*Sonic*, *supra*, 57 Cal.4th 1109, 1152), Skillz cites no case approving an arbitration provision that is one-sided in this manner. To the contrary, we have held a provision such as this one "reflects an attempt to improperly insert a unilateral carve out in the arbitration provision that favors [the drafting party], which demonstrates substantive unconscionability." (*Ali v. Daylight Transport, LLC* (2020) 59 Cal.App.5th 462, 479–480 [assessing an "arbitration provision purporting to allow only [the drafting party] to request a provisional remedy in court"].)[13]

Finally, Skillz relies on our high court's observation that " ' "[a] contract can provide a 'margin of safety' that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable." ' " (*Baltazar*, *supra*, 62 Cal.4th at p. 1250, quoting *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 117.) But the drafter of a one-sided arbitration provision must provide "at least some reasonable justification for such one-sidedness based on 'business realities.' " (*Armendariz*, *supra*, 24 Cal.4th at p. 117.) Skillz, however, does not attempt to justify, for example, the provision requiring users to arbitrate their billing disputes (that do not

---

[13] Indeed, while the law does not assume litigation is inherently advantageous to arbitration, Skillz seems to. "[W]here a drafter of a contract of adhesion believes that arbitration is 'good enough' for all consumer claims but not for any claims it may bring, it is the drafter who holds an aversion to arbitration." (*Perez*, *supra*, 251 F.Supp.3d at p. 1348, italics omitted.)

qualify for small claims court) while permitting Skillz to pursue civil litigation for its billing claims against users.

We conclude the lack of mutuality in the promises to arbitrate in the Terms of Service is substantively unconscionable.[14]

Gostev also cites the $50 cap on liability (see fn. 5), waiver of liability for injury due to hacking, and indemnification clause as non-mutual and one-sided.[15]  These terms are one-sided and inform our assessment of the arbitration provision's substantive unconscionability.  (See, e.g., *Nelson*, *supra*, 77 Cal.App.5th at pp. 663–664 [limiting damages to $2,500 was " ' "yet another version of a 'heads I win, tails you lose' . . . clause that has met with

_____

[14] Here, we pause to emphasize that "[s]ubstantive unconscionability focuses on the *actual terms of the agreement* and evaluates whether they create ' " 'overly harsh' " ' or ' " 'one-sided' " results' [citation], that is, whether contractual provisions reallocate risks in an objectively unreasonable or unexpected manner." (*Wayne v. Staples, Inc*. (2006) 135 Cal.App.4th 466, 480, italics added.)  Skillz argues Gostev has presented "no evidence" that any term is substantively unconscionable as to him.  But Gostev correctly responds that the Terms of Service itself is "evidence of the contract terms and their unconscionability."

[15] Subsection 7.4 provides, "You acknowledge that we are not responsible for any damage, loss or injury resulting from hacking, tampering or other unauthorized access or use of the Services or your Account." Subsection 5, "YOUR INDEMNIFICATION OF US," provides, "You will, at your own cost and expense, indemnify and hold us and our directors, officers, employees and agents harmless from and against any and all claims, disputes, liabilities, judgments, settlements, actions, debts or rights of action, losses of whatever kind, and all costs and fees, including reasonable legal and attorneys' fees, arising out of or relating to (i) your breach of these Terms; (ii) any use of your Account, the Website, the Software and the Services by any person including yourself; (iii) your violation of Applicable Laws; and/or (iv) your negligence or misconduct; and, if we instruct you in writing, you will, at your cost and expense, defend us from any of the foregoing using counsel reasonably acceptable to us."

23

uniform judicial opprobrium" ' "]; the "unilateral release of almost any conceivable claim" was " 'significantly harsh and one-sided' "]; *Lhotka v. Geographic Expeditions, Inc.* (2010) 181 Cal.App.4th 816, 825 (*Lhotka*) [provision limiting damages "guaranteed that plaintiffs could not possibly obtain anything approaching full recompense for their harm"; nonreciprocal limitation on damages and indemnification obligations contributed to the conclusion the arbitration clause was "so one-sided as to be substantively unconscionable"].)

> ### b. *Availability of Public Injunctive Relief*

Public injunctive relief is relief that "benefits the general public" and benefits an individual plaintiff only incidentally "or as 'a member of the general public.' " (*McGill*, *supra*, 2 Cal.5th at p. 955.) (In contrast, private injunctive relief "primarily 'resolve[s] a private dispute' between the parties [citation] and 'rectif[ies] individual wrongs.' " (*Ibid.*)) Public injunctive relief is a remedy available to private plaintiffs under the CLRA and the UCL. (*Id.* at p. 961.) In *McGill*, the California Supreme Court held that an arbitration provision was "invalid and unenforceable under state law insofar as it purport[ed] to waive [the plaintiff's] statutory right to seek" public injunctive relief under these statutes. (*Ibid.*)

Here, the arbitration provision specifies the "arbitrator may award declaratory or injunctive relief only to you individually, and only to the extent required to satisfy your individual claim." Gostev argues this provision violates *McGill*.

Gostev relies on *MacClelland v. Cellco Partnership* (N.D. Cal., July 1, 2022, No. 21-CV-08592-EMC) ___F.Supp.3d.___, ___ [2022 WL 2390997, at *8] (*MacClelland*), which considered an agreement that similarly limited the injunctive relief the arbitrator could award to "injunctive relief *only in favor*

24

*of the individual* party seeking relief and *only to the extent necessary to provide relief warranted by that party's individual claim*." (Italics added.) The district court found this provision "preclud[ed] injunctive relief benefitting anyone other than the individual claimant" and therefore prevented the plaintiffs "from seeking public injunctive relief in any forum, a right which cannot be denied whether in arbitration or otherwise." (*Id.* at p. ___ [2022 WL 2390997, at *8])[16] As a result, the court determined the provision was unenforceable under *McGill*. (*Id.* at p. ___ [2022 WL 2390997, at *10].)

Skillz responds that its arbitration provision does not preclude public injunctive relief because the arbitrator is authorized to award injunctive relief for an "individual claim" and public injunctive relief is available for individual claims under the UCL and CLRA. In *McGill*, our high court recognized that a "private individual" who has " 'suffered injury in fact and has lost money or property as a result of' a violation of the UCL" may bring a private action and, as part of that action, may request public injunctive relief. (*McGill, supra,* 2 Cal.5th at p. 959.) Such an action is filed on the person's own behalf, "not 'on behalf of the general public.' " (*Ibid.*) Thus, according to Skillz, the limitation that an arbitrator may award "injunctive relief only to you individually, and only to the extent required to satisfy your individual

---

[16] Similarly, in *Blair v. Rent-A-Center, Inc.* (9th Cir. 2019) 928 F.3d 819, 831, the arbitration agreement at issue prohibited "the arbitrator from awarding 'relief that would affect [customers] other than you,' and eliminate[d] any 'right or authority for any dispute to be brought, heard, or arbitrated as a class, collective, mass, private attorney general, or representative action.' " The federal appellate court found this provision "thus precludes the arbitrator from awarding public injunctive relief." (*Ibid.*)

claim" does not preclude the arbitrator from awarding public injunctive relief because that relief is available as part of a person's individual claim.

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) Given the myriad limitations in the Terms of Service favoring Skillz, it seems likely that Skillz intended the language at issue would prevent the award of injunctive relief benefitting anyone other than the individual user, but we need not resolve this question of contract interpretation. Even assuming the arbitration provision allows the arbitrator to award public injunctive relief, other terms cited by Gostev render the arbitration provision substantively unconscionable.

c.      *Shortened Limitations Periods*

By statute, the limitations period for a CLRA claim is three years (Civ. Code, § 1783), and the limitations period for a UCL claim is four years (Bus. & Prof. Code, § 17208), but the arbitration provision in this case limits all claims to a one-year statute of limitations.

Parties may contract to a shortened limitations period so long as the limitation is reasonable. (*Ellis v. U.S. Security Associates* (2014) 224 Cal.App.4th 1213, 1222–1223.) However, contractually shortened limitations periods have not been " 'recognized outside the context of straightforward transactions in which the triggering event for either a breach of a contract or for the accrual of a right is immediate and obvious.' " (*Id*. at p. 1223, quoting *Moreno v. Sanchez* (2003) 106 Cal.App.4th 1415, 1430.)

In *Fisher v. MoneyGram International, Inc.* (2021) 66 Cal.App.5th 1084, 1105 (*Fisher*), the Court of Appeal found substantively unconscionable an arbitration provision's one-year limitations period, which was "considerably

shorter than the otherwise applicable four-year limitations period [for the plaintiff's UCL claim] and [wa]s inherently one-sided against complaining consumers." And, in *Magno v. The College Network, Inc.* (2016) 1 Cal.App.5th 277 (*Magno*), the court observed, "An arbitral limitations period that is shorter than the otherwise applicable period is one factor that supports a finding of substantive unconscionability." (*Id.* at p. 291 [arbitration provision was substantively unconscionable where, among other things, it required all claims to be filed within a year of accrual].)

Here, the shortened limitations period (reducing the applicable limitations period by up to 75 percent of the statutory limitations period) is another factor supporting our conclusion that the arbitration provision is substantively unconscionable.

d. *Mandating Arbitration in San Francisco*

Gostev, who lives in Washington, contends it is substantively unconscionable to require him to arbitrate in San Francisco, California. He argues the requirement that arbitration occur out of his home state and hundreds of miles away "is, like many of the provision[s] in this contract, designed solely to discourage Skillz's customers from pursing legitimate claims."

In response, Skillz cites *Intershop Communications v. Superior Court* (2002) 104 Cal.App.4th 191, 201–202, for the proposition, "A forum selection clause within an adhesion contract will be enforced 'as long as the clause provided adequate notice to the [party] that he was agreeing to the jurisdiction cited in the contract.' " But *Intershop* also provides, "contractual forum selection clauses are valid and should be given effect *unless enforcement of the clause would be unreasonable*" (*id.* at p. 196, italics added), and requiring all users of a mobile app to arbitrate their claims in San

27

Francisco regardless of where the users are located strikes us as unreasonable. The forum selection clause contributes to our assessment that the arbitration provision in this case is substantively unconscionable. (See *Magno*, *supra*, 1 Cal.App.5th at pp. 288–289 [requiring college-aged students to travel from San Diego to Indiana to arbitrate claims against a company that solicited their business in California was substantively unconscionable]; *Lhotka*, *supra*, 181 Cal.App.4th 816, 825 [requiring residents of Colorado to mediate and arbitrate in San Francisco contributed to the substantive unconscionability of the arbitration clause].)

       e.     *Attorney's Fee and Costs Provisions*

The arbitration provision states, "Each party . . . shall pay an equal share of the fees and costs of the arbitrator and AAA" and "the arbitrator may award to the prevailing party reimbursement of its reasonable attorneys' fees and costs (including, for example, expert witness fees and travel expenses), and/or the fees and costs of the arbitrator."

In *Newton v. American Debt Services, Inc.* (N.D. Cal. 2012) 854 F.Supp.2d 712, 725, the district court explained the problem with a generic clause authorizing awards of costs and fees to the prevailing party: "This provision contravenes California's Consumers Legal Remedies Act, which requires that court costs and attorney's fees be awarded to a prevailing plaintiff but only permits attorney's fees to a prevailing defendant 'upon a finding by the court that the plaintiff's prosecution of the action was not in good faith.' [(Civ. Code § 1780.)] By eliminating this protection for customers, this provision would expose potential plaintiffs to the risk of having to pay Defendants' attorney's fees even if they brought suit in good faith. By permitting exposure to Defendant's attorney's fees and litigation costs, the Agreements may deter customers with legitimate disputes from

28

bringing suit in contravention of their statutory rights." (See also *Ajamian, supra,* 203 Cal.App.4th at p. 800 [attorney's fee provision was unconscionable where, among other things it imposed an obligation to pay the employer's attorney fees "where [the plaintiff] would have no such obligation under at least one of her California statutory claims"].)

Further, an "arbitration clause should not impose excessive costs relative to the recovery sought." (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 89, fn. 9.) As we have mentioned, the arbitration filing fee for Gostev's nonmonetary claim is $6,250, while the Terms of Service purport to limit damages to $50.

These provisions contribute to our conclusion the arbitration provision is " 'unreasonably favorable to the more powerful party.' " (*Sonic, supra,* 57 Cal.4th at p. 1145.)

D.      *Severance*

"If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." (Civ. Code, § 1670.5, subd. (a).)

In this case, the trial court found the unconscionability of the arbitration provision permeated the agreement such that severance was unavailable. We review the trial court's determination for abuse of discretion. (*Nelson, supra,* 77 Cal.App.5th at p. 664.) " 'The trial court has discretion under this statute to refuse to enforce an entire agreement if the agreement is 'permeated' by unconscionability.' [Citation.] An agreement may be 'permeated with too high a degree of unconscionability for severance

29

to rehabilitate.' [Citation.] ' "The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement." ' " (*Ibid.*)

Having catalogued the many ways the arbitration provision at issue is one-sided, unfair, and designed to discourage users from bringing claims against Skillz, we now conclude the trial court did not abuse its discretion in refusing to enforce it. "There is no single provision [the court] could strike to eliminate its unconscionable taint." (*Fisher*, *supra*, 66 Cal.App.5th at p. 1108; see also *Navas v. Fresh Venture Foods, LLC* (2022) 85 Cal.App.5th 626, 637 ["Given the number of challenged provisions, the court could reasonably find severance was not an acceptable option"]; *Beco*, *supra*, 86 Cal.App.5th at p. 313 [where " 'multiple defects indicate a systematic effort to impose arbitration . . . not simply as an alternative to litigation, but as an inferior forum that works to the [drafter]'s advantage,' " there is no abuse of discretion in the trial court's decision not to sever the numerous unconscionable provisions]; *Magno*, *supra*, 1 Cal.App.5th at p. 292 ["If 'the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms,' the court must void the entire agreement"]; *Nelson*, *supra*, 77 Cal.App.5th at p. 666 [severing the arbitration agreement's unconscionable terms "was not a reasonable option" where the agreement "was rife with unconscionable terms"].)

## DISPOSITION

The order denying the petition to compel arbitration is affirmed.

 

_____

Miller, J.

WE CONCUR:

_____

Stewart, P.J.

_____

Richman, J.

A164407, *Gostev v. Skillz Platform, Inc.*

Court:  San Francisco County Superior Court

Trial Judge:  Hon. Richard Ulmer, Jr.; Hon. Samuel K. Feng

Quinn, Emanuel Urquhart & Sullivan, William B. Adams, Meredith M. Shaw, Xuemeng Wang, Dylan C. Bonfigly, for Defendant and Appellant

Blood Hurst & O'Reardon, Timothy G. Blood, Leslie E. Hurst, Thomas J. O'Reardon, Craig W. Straub; The Law Offices of Andrew J. Brown, Andrew J.Brown; Ellsworth Law Firm, Brian J. Ellsworth, for Plaintiff and Respondent

A164407, *Gostev v. Skillz Platform, Inc.*